A07A1352, A07A1353. QUALITY FOODS, INC. et al.
v. SMITHBERG et al.; and vice versa.
(653 SE2d 486)

JOHNSON, Presiding Judge.

This dispute arises out of the sale of Unit Two in the Paxton Building condominium in Savannah. Quality Foods, Inc. bought the unit from Johan Heinz Lindeman and Gisela Margarette Lindeman, as trustees of the Lindeman Family Trust. Condominium unit owners

---

Roy and Lynn Smithberg, Dennis Barr, Stanley E. Strickland, and C. Ansley Williams (collectively, "the Smithbergs") sued the Lindemans, individually and as trustees of the Trust, Quality Foods, and Darby Bank & Trust Company[1] seeking to have the sale to Quality Foods, as well as certain other conveyances involving Unit Two, set aside on the grounds that the conveyances were in violation of the building's Declaration of Condominium.

Quality Foods and Darby Bank (collectively, "Quality Foods") filed a counterclaim against the Smithbergs and the Paxton Building Condominium Association, Inc. (the "Association") seeking a declaration that, as against the Smithbergs and the Association, they were the lawful owner and mortgagee of Unit Two; that the transactions under which they obtained their interests were not subject to being set aside; and that if the transactions were subject to being set aside that title in Unit Two would re-vest in the Trust. Quality Foods also asserted a claim against the Smithbergs for intentional interference with contractual and business relationships, including a claim for punitive damages.

In Case No. A07A1352, Quality Foods contends that the trial court erred in granting the Smithbergs' motion for summary judgment on its counterclaim for tortious interference with contractual and business relations and for punitive damages. Quality Foods further contends that the trial court erred in denying its motion for partial summary judgment on the Smithbergs' complaint and its counterclaim. The Smithbergs cross-appeal in Case No. A07A1353, contending that they had a right of first refusal to purchase Unit Two in their capacity as individual unit owners, and that the trial court therefore erred in denying their motion for summary judgment. For reasons that follow, we reverse in part and affirm in part the judgment in Case No. A07A1352 and affirm the judgment in Case No. A07A1353.

> We conduct a de novo review of both the law and the evidence on appeal from the grant or denial of a motion for summary judgment. We view the evidence in a light most favorable to the nonmovant in order to determine whether a genuine issue of material fact exists and whether the moving party was entitled to judgment as a matter of law.[2]

---

[1] Darby Bank financed the sale to Quality Foods.

[2] (Punctuation and footnotes omitted.) *Mariner Healthcare v. Foster*, 280 Ga. App. 406, 407 (634 SE2d 162) (2006).

The evidence shows that the Paxton Building, a condominium, was formed and its Declaration of Condominium made on June 17, 1985. The Declaration provides that the condominium is to be operated by the Association, a not-for-profit Georgia corporation. Each floor of the five-story condominium building constitutes a unit. Johan and Gisela Lindeman purchased Unit Two in 1985.

The Lindemans owned a business known as the Boar's Head restaurant, a portion of which was located in Unit Two. In 1996, the Lindemans sold the restaurant and Unit Two to Restaurant Consultants, Inc. After the sale, the Lindemans created the Lindeman Family Trust and transferred the note and deed of trust from the sale to the Trust. In 1997, Restaurant Consultants transferred Unit Two back to the Trust. The Trust then leased the restaurant to Quality Foods in 1998. The five-year lease granted Quality Foods an option to buy Unit Two.

In the fall of 2002, Quality Foods expressed an interest in exercising the option. Quality Foods' attorney sent a letter to the individual unit owners requesting that the owners confirm that they had no interest in purchasing Unit Two. Roy Smithberg responded that he could not sign a waiver of first refusal because he was interested in the property.

On January 15, 2003, the Lindemans advised the Association of the Trust's intent to sell Unit Two to Quality Foods. The notice stated that "it is our understanding that the Association has 30 days from the receipt of this notice to either approve or disapprove of the transaction." After consulting with his attorney, Roy Smithberg prepared a letter in which the Trust was "informed that it is the decision of the Association that the sale not be approved." The letter, dated January 29, 2003, is addressed to the Trust and signed on behalf of the Association by Timothy Hargus, President, and Dennis Barr, Secretary. Below these signatures, the document provides: "The decision of the Association is agreed and consented to" by Tomas A. Paxton, Jr. and Roy Smithberg. Hargus, Barr, Paxton, and Roy Smithberg owned or represented the owners of the four condominium units other than Unit Two.[3] Notwithstanding the foregoing correspondence, the Trust sold Unit Two to Quality Foods on March 7, 2003. This lawsuit followed.

---

[3] Barr and his partners, for whom Barr had authority to act, owned Unit One. Smithberg and his wife owned Unit Three; Hargus was the chief executive of Historic Investments of the South, Inc., which owned Unit Four; and Paxton owned Unit Five.

*Case No. A07A1353*

1. The Smithbergs contend that they as individual unit owners, rather than the Association, possessed the right of first refusal to purchase Unit Two, and that the trial court erred in denying their motion for summary judgment on this claim. We disagree.

Condominium instruments, which include the declaration of condominium, are "analogous to an 'express contract' between the unit owners/members and the condominium association."[4] These instruments are "strictly construed as they are written, giving the language its clear, simple, and unambiguous meaning."[5]

Section 16 (a) of the Declaration provides:

> No Unit Owner may effectively dispose of a Unit or any interest therein by sale or any interest therein by sale or lease, except to another Unit Owner in the Condominium, without the prior written approval of the Association, which approval shall be in the nature of a right of first refusal.

Under Section 16 (b), an owner desiring to sell or lease a unit is required to "give to the Association notice of such intention, together with the name and address of the intended purchaser or lessee." Notice to the Association may, at the unit owner's option, "include a demand by him that the Association furnish a purchaser if the proposed purchaser is not approved." The Association is required to approve or disapprove the proposed transaction within 30 days of the receipt of notice.

Under Section 17 (a) of the Declaration:

> If the Association disapproves a proposed sale or lease and if the notice of sale or lease given by the Unit Owner shall so demand, then within 30 days after receipt of such notice and information, the Association shall deliver . . . to the Unit Owner an offer to purchase or lease by a purchaser or lessee, as the case may be, approved by the Association who will purchase and to whom the Unit Owner must sell or lease the Unit, as the case may be.

Based on the clear, simple, and unambiguous meaning of the Declaration, there is no right of refusal granted to the unit owners such as the Smithbergs. Rather, as the Declaration provides, the

---

[4] (Footnote omitted.) *Bradford Square Condo. Assn. v. Miller*, 258 Ga. App. 240, 245 (1) (a) (573 SE2d 405) (2002).

[5] (Footnote omitted.) Id.

Association has certain rights "in the nature of a right of first refusal." Notice of the proposed transaction must be given to the Association, not the unit owners; it is the Association which must approve or disapprove of the transaction, not the unit owners; and it is the Association which must provide an alternate purchaser or lessee in the event that it disapproves the proposed transaction, but only if the unit owner selling or leasing the property has so demanded.

The Smithbergs point to evidence that the Association members, including the Lindemans, believed that the unit owners had a right of first refusal, and they rely upon the principle that in certain cases "[t]he meaning placed on the contract by one party and known to be thus understood by the other party at the time shall be held as the true meaning."[6] But "[w]henever the language of a contract is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required or even permissible, and the contractual language used by the parties must be afforded its literal meaning."[7] As there is no ambiguity in the Declaration insofar as the right of unit owners to exercise a right of first refusal, the rules of construction could not be employed to insert such a right where none existed. "[W]here the terms of the contract are clear and unambiguous, the court looks only to the contract to find the parties' intent."[8] It follows that the Smithbergs' additional claims that specific performance should be granted to allow them to exercise their individual right of first refusal, and that both the lease by the Trust to Quality Foods and the notice of and sale of Unit Two triggered their individual rights of first refusal, must also fail.[9] The trial court did not err in denying the Smithbergs' motion for summary judgment as to these claims.

2. The Smithbergs also contend that the trial court erred in denying summary judgment on their claim that Quality Foods was not entitled to declaratory relief. We disagree.

As a rule, "declaratory judgment is not available to a party seeking to resolve potentially adverse claims to land when that party cannot show that he needs direction in order to handle an existing controversy."[10] Rather, a party must show that declaratory judgment

---

[6] (Citation and punctuation omitted.) *IH Riverdale, LLC v. McChesney Capital Partners*, 280 Ga. App. 9, 12 (1) (a) (633 SE2d 382) (2006).

[7] (Footnote omitted.) *First Data POS v. Willis*, 273 Ga. 792, 794 (2) (546 SE2d 781) (2001).

[8] *Gill v. B & R Intl.*, 234 Ga. App. 528, 530 (1) (a) (507 SE2d 477) (1998).

[9] The Smithbergs also contend that the trial court erred in concluding that the title to Unit Two should revert to the Trust in case the sale to Quality Foods is subject to being set aside, but this claim is moot in light of our conclusion in Case No. A07A1352 that the sale is not currently subject to being set aside.

[10] (Footnote omitted.) *Smith v. Jones*, 278 Ga. 661, 662 (1) (604 SE2d 187) (2004).

is necessary to relieve the risk of taking some future undirected action.[11]

In this case, there is an actual, ongoing controversy as to Quality Foods' and the Smithbergs' rights in Unit Two, and so the claim is not a matter of academic interest.[12] Quality Foods shows that it risks taking future undirected action with regard to its interest in the Boar's Head restaurant, which is located in part in Unit Two, unless the controversy is addressed.[13] "[D]isputes concerning ownership of or right of access to land are classic candidates for resolution via declaratory judgment."[14] Accordingly, we conclude that the trial court correctly denied the Smithbergs' motion for summary judgment on Quality Foods' counterclaim for declaratory judgment.

## Case No. A07A1352

3. Quality Foods contends that the trial court erred in denying its motion for summary judgment because the Trust was not required to obtain the Association's approval to sell Unit Two. We agree because there is no issue of material fact as to whether the Declaration's "lender" exception applied to the sale by the Trust to Quality Foods, and the trial court erred in concluding that the issue was for the jury.

(a) Section 17 (b) of the Declaration provides that the provisions of Section 16 and Section 17, which require the Association's approval or disapproval of the transfer or lease of units, do not apply to a "lender" who "acquires its title as the result of owning a mortgage upon the Unit concerned, and this shall be so whether the title is acquired by deed from the mortgagor or through foreclosure proceedings." Quality Foods contends that the Trust was a lender for purposes of the Declaration because it held a deed to secure debt on Unit Two and then acquired Unit Two from Restaurant Consultants on March 20, 1997 by deed in lieu of foreclosure. The Smithbergs respond that a lender, for purposes of the Declaration, is limited to institutional and commercial lenders and does not apply to owner-financed mortgages.[15] We disagree with the Smithbergs.

---

[11] *Porter v. Houghton*, 273 Ga. 407 (542 SE2d 491) (2001).

[12] Compare *Moore v. Young*, 101 Ga. App. 553 (114 SE2d 446) (1960) (declaratory judgment not proper for determining nature of interest in land created by mineral rights grant where no actual controversy was shown between plaintiffs and defendants).

[13] See *Smith*, 278 Ga. at 662 (1) (owner's possession of property did not alleviate need to resolve ongoing controversy as to another party's right to re-enter the property). Compare *Farmers Union Warehouse &c. v. Bird*, 224 Ga. 842, 844 (165 SE2d 148) (1968) (plaintiffs were not entitled to declaratory relief because they failed to show any need for guidance and protection from uncertainty and insecurity with respect to the propriety of their future acts).

[14] (Citation and punctuation omitted.) *Smith*, 278 Ga. at 662 (1).

[15] The Association has adopted all of the Smithbergs' arguments for purposes of the appeal.

In construing contracts,

> [t]he trial court must first decide whether the contract language is ambiguous. If it is, the trial court then applies the applicable rules of contract construction in OCGA § 13-2-2. If an ambiguity still remains, it must be resolved by the trier of fact. In construing a contract, courts must give words their usual and common meaning. And the entirety of the agreement should be looked to in arriving at the construction of any part. The contract is to be considered as a whole, and each provision is to be given effect and interpreted so as to harmonize with the others.[16]

The trial court determined that there was a question of material fact as to the definition of the term "lender." As the trial court noted, "lender" is not a defined term in the Declaration. But in construing contracts words generally bear their usual and common signification,[17] and under common usage a lender is "[a] person or entity from which something (esp. money) is borrowed."[18] Thus, the Trust is not precluded from being a lender under the usual and common signification of the term.

The Smithbergs argue that the term "lender" is ambiguous in light of Section 23 (e) of the Declaration, which provides that the approval of at least 51 percent of the "institutional mortgagees" holding mortgages on units is required to amend certain material provisions of the condominium documents. This approval requirement pertains to, among other things, any amendments relating to the imposition of a right of first refusal on a unit owner to sell his unit. But we cannot conclude that because Section 23 of the Declaration provides certain protections to institutional mortgagees that a "lender," for purposes of Section 17 (b), refers to an institutional mortgagee. For instance, under Section 17 (b), if "a purchaser" buys a unit at a public sale, such as foreclosure sale, then the purchaser is exempt from the Declaration's transfer approval requirements. Thus, the Declaration necessarily contemplates that persons who are not institutional mortgagees may be exempt from the transfer approval requirements. Construing the Declaration as it is written, and giving the language its clear, simple, and unambiguous meaning, "lender,"

---

[16] (Citations and punctuation omitted.) *Blueshift, Inc. v. Advanced Computing Technologies*, 273 Ga. App. 802, 805 (2) (616 SE2d 816) (2005).

[17] OCGA § 13-2-2 (2).

[18] Black's Law Dictionary, p. 921 (8th ed. 2004).

for purposes of Section 17 (b), does not mean "institutional mortgagee." Thus, there was no question for the jury insofar as the definition of lender in Section 17 (b).

(b) The Smithbergs argue that even if the Trust is eligible to be a lender for purposes of Section 17 (b), it is not a lender. We first consider the Smithbergs' challenge to the validity of the transfer of the note payable by Restaurant Consultants and the associated security deed from the Lindemans to the Trust. The assignment leaves the principal amount and date of the assigned instruments blank, but identifies the instruments as the note and mortgage from Restaurant Consultants to the assignors, and "secured by the real and personal property located at the Boar[']s Head restaurant, Savannah, GA." The assignment possesses parties, subject matter, mutual assent, and consideration, and was therefore valid to assign the instruments.[19]

(c) The Smithbergs also challenge whether the Trust obtained title to Unit Two through a deed in lieu of foreclosure. Johan Lindeman averred that Restaurant Consultants did not fulfil its obligation under the mortgage and the property was conveyed to the Trust "by a Warranty Deed in Lieu of Foreclosure dated March 20, 1997."[20] The Smithbergs point out that, among other things, the warranty deed from Restaurant Consultants does not state that it is a deed in lieu of foreclosure, and contend that a transfer tax was paid on the deed although not required by OCGA § 48-6-2 as to deeds issued in lieu of foreclosure. However, the record shows that Restaurant Consultants had been in default on its loan and Unit Two was conveyed to the Trust after a threat to foreclose. The exemption provided by the Declaration requires only that the lender "acquires its title as the result of owning a mortgage[21] upon the Unit concerned, and this shall be so whether the title is acquired by deed from the mortgagor or through foreclosure proceedings." The Smithbergs fail to point to any evidence that is inconsistent with the Trust having acquired its title as a result of owning a security title to Unit Two, as averred by Lindeman.

(d) The Smithbergs further contend that the 1996 sale from the Lindemans to Restaurant Consultants did not comport with the requirements of the Declaration and that therefore the Trust could not have taken the property from Restaurant Consultants as a lender

---

[19] *Bank of Cave Spring v. Gold Kist, Inc.*, 173 Ga. App. 679, 680 (1) (327 SE2d 800) (1985).

[20] "It is not uncommon for a mortgagor who is unable to pay the secured debt to convey the property outright to the mortgagee." Hinkel, Pindar's Georgia Real Estate Law and Procedure, § 20-46, Vol. 2 at 547 (6th ed. 2004).

[21] As defined in the Declaration, "mortgage" includes a "deed to secure debt or other instrument conveying security title."

in 1997. The Lindemans did not obtain the Association's written approval to transfer the property to Restaurant Consultants as required by the Declaration, nor does Quality Foods show that the Lindemans notified the Association in advance of the sale. Pursuant to the Declaration,

> [i]f the notice to the Association herein required is not given, then at any time after receiving knowledge of a transaction or event transferring ownership or possession of a Unit, the Association at its election and without notice may approve or disapprove the transaction or ownership.

Notwithstanding the foregoing, the record fails to show that the Association has ever disapproved the sale to Restaurant Consultants. Accordingly, the 1996 sale is not currently subject to being set aside. Whether a hypothetical future disapproval of the 1996 transaction by the Association would be effective is not appropriate for determination by declaratory judgment.[22]

(e) In light of the foregoing, we conclude that the Trust acquired Unit Two as a lender for purposes of Section 17 (b) of the Declaration. The Trust's sale to Quality Foods was therefore not required to be approved by the Association. It follows that Quality Foods' claims that the Association's disapproval of the sale was otherwise invalid are moot. Quality Foods and Darby Bank are entitled to declaratory judgment that as against the Smithbergs and the Association they are currently the lawful owner and mortgagee of Unit Two, and that their interests are not currently subject to being set aside.

4. Quality Foods contends that the trial court erred in granting the Smithbergs' motion for summary judgment on Quality Foods' counterclaim for tortious interference with business and contractual relations. We disagree.

> To establish a cause of action for wrongful interference with contractual relations, in addition to demonstrating the existence of a valid contract, a plaintiff must show that the defendant: (1) acted improperly and without privilege; (2) acted purposely and maliciously with the intent to injure; (3) induced a third party not to enter into or to continue a

---

[22] See *Bd. of Natural Resources v. Monroe County*, 252 Ga. App. 555, 557 (1) (556 SE2d 834) (2001) ("[d]eclaratory judgment will not be rendered based upon a possible or probable future contingency because such a ruling would be an erroneous advisory opinion") (citation and punctuation omitted).

business relationship with the plaintiff; and (4) caused the plaintiff some financial injury.[23]

Quality Foods claims that the Smithbergs improperly procured the Association's disapproval of the sale of Unit Two, and that the Smithbergs' actions have therefore impaired Quality Foods' performance of contracts related to Unit Two, including the operation by Quality Foods of the Boar's Head restaurant, a lease between Quality Foods and a third party for another portion of the restaurant, and the promissory note and deed to secure debt between Quality Foods and Darby Bank.[24] Pretermitting whether Quality Foods has shown that the Smithbergs' actions interfered with their contractual and business relationships, the Smithbergs' actions were not improper. "The exercise of an absolute legal right is not and cannot be considered an interference with a contractual or potential contractual relationship."[25] The Trust notified the Association that it intended to sell Unit Two to Quality Foods and stated that "it is our understanding that the Association has 30 days from the receipt of this notice to either approve or disapprove of the transaction." The Smithbergs, as members of the Association, had a legitimate interest in whether the Association approved or disapproved of the sale. If the Smithbergs' actions in voting for and advocating that the Association disapprove the sale otherwise interfered with Quality Foods' contractual relationships, it does not make the Smithbergs' actions tortious.[26] Accordingly, the trial court did not err in granting summary judgment to the Smithbergs on Quality Foods' claim for interference with business and contractual relations and for Quality Foods' related punitive damages claim.

*Judgment affirmed in part and reversed in part in Case No. A07A1352. Judgment affirmed in Case No. A07A1353. Phipps and Mikell, JJ., concur.*

DECIDED OCTOBER 9, 2007 —
RECONSIDERATION DENIED OCTOBER 25, 2007 — ■

---

[23] (Citation omitted.) *Carroll Anesthesia Assoc. v. AnestheCare, Inc.*, 234 Ga. App. 646, 647 (1) (507 SE2d 829) (1998).

[24] "Where the interference retards performance of the duties under the contract, it is actionable." (Citation omitted.) Id. at 648 (1).

[25] *Disaster Svcs. v. ERC Partnership*, 228 Ga. App. 739, 742 (492 SE2d 526) (1997).

[26] See *Sommers Co. v. Moore*, 275 Ga. App. 604, 605 (621 SE2d 789) (2005) (ancillary consequences of otherwise proper transaction does not make action tortious).

*Brennan, Harris & Rominger, Richard J. Harris, Holland & Knight, John M. Hamrick, Gregory J. Digel*, for appellants.

*Weiner, Shearouse, Weitz, Greenberg & Shawe, N. Harvey Weitz, Michael L. Edwards, Anthony R. Casella, Hunter, MacLean, Exley & Dunn, Timothy R. Walmsley*, for appellees.