A08A1621. SAVANNAH YACHT CORPORATION et al. v. THUNDERBOLT MARINE, INC.
(676 SE2d 728)

ELLINGTON, Judge.

This appeal is the latest episode in a longstanding dispute between Thunderbolt Marine, Inc. ("Thunderbolt"), the owner and lessor of commercial property on the Intracoastal Waterway in Savannah, and Palmer Johnson Savannah, Inc. ("PJS"), the lessee, which operated a marina and yacht repair business there. Some time after PJS first brought a declaratory judgment action to determine its responsibility under its lease, and shortly after it sublet the property to unapproved subtenants, a bulkhead wall in the property's yacht repair area collapsed. At the conclusion of the litigation that followed, a Chatham County jury rendered a verdict of $4.24 million in Thunderbolt's favor, the trial court entered judgment on that verdict, and the defendants brought the instant appeal. On appeal, PJS's successor-in-interest, Savannah Yacht Corporation, argues that the trial court erred when it denied its motions for summary judgment and for directed verdict concerning Thunderbolt's claims for rent, maintenance and repair, and attorney fees. The subtenants join Savannah Yacht's arguments and add that the trial court erred in its construction of the lease and in its submission of an alleged ambiguity in the parties' use of the term "bulkhead" to the jury. We agree that the trial court erred when it allowed the jury to

---

[12] See *Holman*, supra.

consider Thunderbolt's claims for rent, maintenance, and repair. We therefore reverse the judgment rendered on these claims, vacate the award of attorney fees, and remand for further proceedings on the issue of attorney fees.

Although we view the record in the light most favorable to Thunderbolt and the jury's verdict,[1] most of the relevant facts are undisputed. In March 1992, PJS entered into an agreement to lease the property at issue for PJS's use as a marina and yacht repair facility. The north side of the property, including a concrete bulkhead built in the 1960s or 1970s, housed the marina serving boats on the intracoastal waterway along the Wilmington River; the south side, including a steel bulkhead dating from the 1980s, contained the yacht repairing and retrofitting works.

Section 9.01 of the lease, entitled "Maintenance and Repair," provided as follows:

> [PJS], at its sole cost, risk, expense and liability, shall keep and maintain all of the Property . . . in good order, repair, and condition, and shall make all structural, non-structural and mechanical, foreseen and unforeseen and ordinary and extraordinary repairs which may be required . . . , normal wear and tear excepted. Provided, however, that [PJS] shall not be required to make structural replacements and repairs for any latent structural defects unknown to [PJS] on the date of its execution of this Agreement, unless such latent structural defects are caused or occasioned by the acts of [PJS] or the failure of [PJS] to maintain or repair the property in accordance with the provisions of this Lease.

Section 24.03 of the lease provided that in the case of PJS's default, Thunderbolt's options included (a) re-entering the property; (b) re-leasing the property and recovering "any deficiency that may arise by reason of such re-leasing"; (c) suing PJS for unpaid rent or damages; and (d) doing "whatever [PJS] is obligated to do" under the terms of the lease, "in which event [PJS] shall reimburse [Thunderbolt] on demand for any expenses," including attorney fees.

The first dispute over the lease arose in 2001, when PJS filed an action for declaratory judgment concerning its obligations under the lease to repair a Syncrolift and a failing concrete bulkhead. Thunderbolt counterclaimed and sought damages, arguing that PJS had breached the lease. After a bench trial, the trial court entered an

---

[1] *Cohen v. Lowe Aviation Co.*, 221 Ga. App. 259, 260 (1) (470 SE2d 813) (1996).

order on April 1, 2002 finding, inter alia, that problems with the north bulkhead, the sidewalks above which were failing, were not caused by "latent structural defects" and that PJS was thus obligated to repair them.

In May 2002, while PJS's application for interlocutory appeal from this order was pending, the parties executed a settlement agreement extending the lease through March 2007 and specifying that the agreement's provisions "constitute modifications to, and are hereby incorporated in, the Lease." Section 1 of the settlement agreement provided:

> The parties accept and agree to the order of the Court dated April 1, 2002, . . . and specifically agree to the Court's interpretation relating to the following matters:
>
> A. Any ambiguity in the Lease created by the phrase "normal wear and tear" . . . requires PJS to maintain the premises in a "serviceable and tenantable condition" . . .
>
> B. *Problems with the bulkhead noted at trial and in the Order are not the result of a latent defect.* In addition to the findings in the Order, it is agreed that since the beginning of the Initial Term through the date of signing this agreement, PJS has not discovered any latent structural defects on the Property due to which PJS claims that its maintenance and repair obligations under the Lease are in any way limited. PJS waives any defense it might otherwise have that a need for maintenance and repair of any of the following enumerated items of the Property is necessitated by a "latent structural defect," and shall repair and maintain these . . . so that the same are at all times kept in good order, repair, and condition. . . .

(Emphasis supplied.) Section 1 (B) then listed seven items on the property, the third of which was described as "Bulkhead and related or adjacent structures, including sidewalks[.]" Section 1 (B) also provided that "[t]he acceptance by PJS of responsibility for repair and maintenance of the above listed items . . . including any latent structural defects . . . shall not adversely affect PJS' defenses under Section 9.01 of the Lease for other latent structural defects which [PJS] may hereafter discover on the Property."

Paragraph 6 of the settlement agreement also addressed the issue of bulkhead maintenance as follows:

> Bulkhead. PJS will immediately remove the sidewalk as

necessary in areas immediately adjacent to the gift shop and perform necessary excavation to determine the reasons for the sidewalk failure and *make any necessary repairs to the bulkhead* after which time the sidewalk will be replaced. . . . PJS will perform such additional repairs . . . with all such work to be completed by April 1, 2004. *PJS will continue with regular maintenance and repair* of the *bulkheads* through the Expiration Date. . . .

(Emphasis supplied.) The settlement agreement also created a Maintenance and Repair Fund, requiring PJS to make an initial $500,000 contribution as well as $25,000 monthly payments from April 2002 through the termination of the lease in March 2007. PJS was responsible for maintaining a minimum Fund balance of $200,000.

On February 13, 2003, after informal negotiations between PJS and Thunderbolt, PJS asked Thunderbolt for permission to sublease the property to Palmer Johnson Savannah, LLC and its principal, Timur Mohamed ("the subtenants"), noting that the subtenants would retain all employees. Before Thunderbolt gave its written consent, PJS sold its assets to the subtenants and executed a sublease and indemnification agreement with them. The subtenants took possession of the property in March 2003, and Thunderbolt was aware of that possession by April. In late April 2003, the south steel bulkhead partially collapsed. PJS had noticed some deflection in the steel sheet pile wall of the south bulkhead as early as September 2002, had asked the engineers designated in the settlement agreement to investigate, and had acted on the engineers' recommendation to install monitoring devices on the south bulkhead walls.

Thunderbolt accepted the subtenants' first rent and maintenance checks and received rent through September 2003. Although PJS had made its initial payment of $500,000 as well as eighteen monthly payments of $25,000, the Maintenance and Repair Fund balance had fallen by August 2003 to $136,092, which is almost $64,000 less than the $200,000 minimum required under the settlement agreement. Also in August, Thunderbolt filed a dispossessory action against the subtenants. The trial court ordered the subtenants to vacate the property by September 30, 2003, which they did. Thunderbolt gave PJS notice of default, re-entered the property, and commenced business operations there, keeping the marina and yacht repair facilities in operation and maintaining the property in good order. Although Thunderbolt initially suffered losses, it had net profits of $1.22 million in 2006.

In September 2004, Thunderbolt moved for summary judgment in the instant action concerning the legal effect of its decisions to

withhold consent to PJS's sublease to the subtenants and to re-enter the property, as well as its counterclaims for maintenance, repair, and rent. The appellants also moved for summary judgment, arguing that Thunderbolt had unreasonably withheld its consent from the proposed sublease and that its re-entry had relieved them of liability. In February 2007, the trial court granted that portion of Savannah Yacht's motion against the LLC and Mohamed concerning the south bulkhead failure, but denied the remainder of the cross-motions. The appellants took a direct appeal from the trial court's denial of summary judgment, which this Court dismissed because a party seeking to appeal a denial of summary judgment must do so by application for interlocutory review.[2]

In July 2007, the appellants dismissed their claim that Thunderbolt had unreasonably withheld its consent to the proposed sublease. In September and October, the trial court severed claims between Savannah Yacht on one side and the subtenants on the other and ordered that these parties' claims against Thunderbolt should proceed to trial first. Accordingly, the trial court redesignated Thunderbolt as plaintiff, Savannah Yacht and its principal Andrew McKelvey[3] as defendants, and the subtenants as third-party defendants. Thus realigned, the case went to trial on October 15, 2007.

At the close of the evidence, both sides moved for directed verdict on the same issues outlined in their cross-motions for summary judgment. The trial court first made findings as a matter of law that PJS had defaulted on the lease and that Thunderbolt's re-entry did not terminate the lease. The trial court then ruled that the lease, the settlement agreement, and a dredging agreement were separate documents, and the court did not construe them together. As to the settlement agreement, the court found that because the term "bulkhead" was not defined in the settlement agreement, and because there had been conflicting testimony at trial as to what the parties meant by the word, issues of fact remained as to the meaning of "bulkhead" and whether the appellants had waived its defenses with respect to the south bulkhead. The trial court announced that it was leaving the issue of damages under each agreement for the jury.

The verdict form allowed the jury to find damages in four categories — rent, maintenance and repair, dredging, and miscellaneous — such that the jury could award anything from zero to the total amount requested in each category. The verdict form also authorized the jury to award attorney fees. The trial court charged

---

[2] See OCGA § 5-6-34 (b).

[3] With the consent of the appellees, Mr. Felix Kent, as executor of the estate of Andrew McKelvey, is substituted as a party to this appeal.

the jury that it could only award attorney fees pursuant to OCGA § 13-6-11 "if the defendant has acted in bad faith or has been stubbornly litigious" and noted that the contractual claim for fees under the lease was not before the jury as that claim had been eliminated from the case.

The jury awarded Thunderbolt $1,086,829 for rent, $2,329,349 for maintenance and repair, $473,926 for dredging, and $18,209 for miscellaneous expenses. The jury also found that Thunderbolt was entitled to an award of attorney fees. After a hearing on the issue of fees, the trial court awarded $340,000 in fees and entered judgment on the jury's verdict in the total amount of $4,248,313. This appeal followed.

1. The appellants argue that because the settlement agreement unambiguously limits their waiver of defenses to the north bulkhead, the trial court erred when it denied their motions for summary judgment and directed verdict concerning Thunderbolt's claims for maintenance and repair arising from the collapse of the south bulkhead. We agree.

Here, the appellants' argument turns upon the construction of a contract, which construction involves a question of law for the court to resolve based on the intent of the parties as reflected in the agreement. See *Deep Six, Inc. v. Abernathy*, 246 Ga. App. 71, 73 (2) (538 SE2d 886) (2000); OCGA § 13-2-1. We review this issue de novo. *Deep Six, Inc.*, supra, 246 Ga. App. at 73 (2). First, we must determine if the contract language is ambiguous, and, if so, then we apply the appropriate rules of construction set forth in OCGA § 13-2-2. "Where the language of a contract is plain and unambiguous, [however,] no construction is required or permissible and the terms of the contract must be given an interpretation of ordinary significance." (Citation and punctuation omitted.) *Race, Inc. v. Wade Leasing, Inc.*, 201 Ga. App. 340, 341 (1) (411 SE2d 56) (1991).

Further, like "other contracts, a settlement agreement must be construed in its entirety and in a manner that permits all of the terms contained therein to be consistent with one another." (Citation and punctuation omitted.) *Interfinancial Midtown, Inc. v. Choate Constr. Co.*, 284 Ga. App. 747, 750 (2) (644 SE2d 281) (2007).

> A settlement agreement must meet the same requirements of formation and enforceability as other contracts. Only when a meeting of the minds exists will an agreement be formed. But the law also favors compromise, and when parties have entered into a definite, certain, and unambiguous agreement to settle, it should be enforced.

(Citation omitted.) Id.

(a) The settlement agreement at issue here specified that it merely modified, rather than supplanted, the lease. It also explicitly stated that its adoption "[would] not adversely affect PJS' defenses under Section 9.01 of the Lease for other latent structural defects which PJS may hereafter discover on the Property." The trial court thus erred when it failed to read the lease and the settlement agreements together with the goal of effectuating the intention of the parties. See *Burns v. Gleason*, 183 Ga. App. 245, 247 (2) (a) (358 SE2d 646) (1987) (where parties explicitly incorporated a lease in a subsequent agreement, their intention to enter into "a non-divisible series of agreements was unambiguously established").

(b) On its face, the settlement agreement's subject is the dispute over the bulkhead litigated at the earlier bench trial and adjudicated in the trial court's order of April 1, 2002 — that is, the dispute over the *north* bulkhead, the sidewalks adjacent to which were showing signs of failure. The question, then, is whether the settlement agreement resulted in a waiver of the appellants' defenses under the lease concerning the south bulkhead.

As the trial court noted, the settlement agreement does not define the term "bulkhead." Our first responsibility is thus to determine the ordinary and common meaning of this term. OCGA § 13-2-2 (2). The Oxford English Dictionary renders the term's origins as nautical, noting that it has often been used in the plural: "*one of the upright partitions* serving to form the cabins of a ship or to divide the hold into distinct watertight compartments." 1 New Shorter Oxford English Dictionary, p. 292 (1993 ed.). This plural usage survives in the Random House Dictionary as "*any of various wall-like constructions* inside a vessel, as for forming watertight compartments, subdividing space, or strengthening the structure," or, as used in its civil engineering context, as "a retaining structure of timber, steel, or reinforced concrete, used for shore protection and in harbor works." (Emphasis supplied.) Random House Webster's Unabridged Dictionary, p. 275 (2nd ed. 1997).

These definitions reveal that a bulkhead is the nautical equivalent of a wall or partition, demonstrating that more than one bulkhead can exist as part of a single, larger structure. Thus, the common meaning of the term comports with the settlement agreement's distinction between PJS's bargained-for obligation in that agreement to make extensive repairs to a *single* bulkhead (the north one, constructed of concrete in the 1960s or 1970s and used as a marina) and its separate obligation in the lease merely to maintain all the property's "bulkheads," including the south one (constructed of steel in the 1980s and used for yacht repair). By contrast, nothing in the lease or the settlement agreement supports the view expressed by the president of Thunderbolt at trial that the parties executing

those documents considered the marina and yacht property as "2,000 feet of bulkhead," "all one structure," and "all linked together."

"[W]here the terms of the contract are clear and unambiguous, the court looks only to the contract to find the parties' intent." (Citation and punctuation omitted.) *Quality Foods v. Smithburg*, 288 Ga. App. 47, 51 (1) (653 SE2d 486) (2007). Because the unambiguous terms of the settlement agreement waived PJS's defenses only as to the "concrete" or *north* bulkhead "noted at trial" the trial court erred when it denied the appellants' motions for directed verdict on this issue. See id. (affirming grant of summary judgment where meaning of condominium instrument was unambiguous). We therefore reverse the jury's verdict as it pertains to the cost of repairs to the south bulkhead.

2. The appellants also argue that the trial court erred when it denied their motion for directed verdict on Thunderbolt's rent claim. We agree.

It has long been the rule in Georgia that "[a] surrender of a lease by operation of law may arise from any condition of facts voluntarily assumed by the parties and incompatible with the continued existence of the relation of landlord and tenant between them." (Punctuation omitted.) *Rucker v. Tabor*, 127 Ga. 101, 102 (56 SE 124) (1906). Where a landlord "exercises a control over the premises inconsistent with the tenant's right of occupation, he thereby discharges the tenant from liability for future rent, and a cancellation or rescission of the contract is thus effected by agreement of the parties, express or implied." *Wright v. Kilgo*, 212 Ga. 712, 713 (95 SE2d 7) (1956).

More specifically, where a landlord himself has retaken a property vacated by a tenant, thus "getting the use of the premises for himself," any charging of rent after repossession is "not only illegal but wholly inequitable." *Baldwin v. Lampkin*, 14 Ga. App. 828 (82 SE 369) (1914), citing *Gay v. Peake*, 5 Ga. App. 583 (63 SE 650) (1909). In *Gay*, for example, the plaintiff landlord allowed members of his family to occupy the property after the defendant tenants had abandoned it. *Gay v. Peake*, 5 Ga. App. at 584-585. We held that where "the plaintiff's own testimony showed that he was not entitled to recover for the full year's rent, on account of his admitted resumption of the possession," the tenants were entitled to a nonsuit, or judgment as a matter of law. Id. Likewise, in *Brock Enterprises v. Dunham's Bay Boat Co.*, 292 AD2d 681 (N.Y. App. Div. 2002), the court held that where a landlord took repossession of a boat repair facility, allowed another tenant to take possession, and began accepting rent from that tenant, the landlord's conduct "demonstrated an 'intent to terminate the lease and use the prem-

ises for (its) own benefit' " as a matter of law. Id. at 683.

Although Thunderbolt notified PJS that under the lease's re-entry clause (Section 24.03), the latter would be responsible for all rent due through the remainder of the lease term, it is undisputed that Thunderbolt forced PJS's subtenant in possession to vacate the property, declared PJS in default under the lease without demanding the tenant's return to the property, and repossessed the property itself, thereafter commencing its own marina and yacht repair business operations there. Under these circumstances, the lease was terminated by operation of law, releasing PJS from its obligation to pay rent from October 1, 2003. *Gay v. Peake*, 5 Ga. App. at 585 (remanding with direction to enter nonsuit for defendant tenants); *Brock Enterprises v. Dunham's Bay Boat Co.*, 292 AD2d at 683 (affirming grant of summary judgment to tenant). We therefore reverse the jury's verdict as it pertains to Thunderbolt's claims for rent due after October 1, 2003.

3. Given our holdings above, Savannah Yacht's claim of error pertaining to the trial court's charge on the law of contract construction is moot.

4. In light of our decision to reverse the jury's verdict to the extent set out and explained in Divisions 1 and 2 of this opinion, we vacate the jury's award of attorney fees and remand the case to the trial court for further proceedings and to determine what, if any, remaining claims would authorize an award of fees under OCGA § 13-6-11 and to apportion them appropriately. See *Internal Medicine Alliance, LLC v. Budell*, 290 Ga. App. 231, 240 (6) (659 SE2d 668) (2008) (Fees awarded pursuant to OCGA § 13-6-11 must be apportioned to those attorney fees attributable to claims on which the plaintiff prevailed.).

*Judgment reversed in part, vacated in part, and case remanded with direction. Smith, P. J., and Adams, J., concur.*

DECIDED MARCH 2, 2009 —
RECONSIDERATION DENIED MARCH 27, 2009

*Inglesby, Falligant, Horne, Courington & Chisholm, Sam P. Inglesby, Jr., Owen C. Murphy, Carrie H. Bacon, Ellis, Painter, Ratterree & Adams, Paul W. Painter, Jr.*, for appellants.

*Oliver & Maner, Christopher L. Ray, James L. Pannell*, for appellee.