A06A0611. IH RIVERDALE, LLC et al. v. McCHESNEY CAPITAL
PARTNERS, LLC et al.
(633 SE2d 382)

ADAMS, Judge.

Through their respective limited liability companies, George McChesney and Geoff Nolan agreed to develop an apartment complex in Clayton County to be known as the Meadow View Apartments ("Phase I"). One provision of the parties' agreement gave Nolan a right of first refusal to participate in the development of an additional apartment complex to be known as Meadow Springs Apartments ("Phase II"). The primary question in this case is whether that right was properly offered and accepted.

A third party, Schejola Partners, LP, ultimately invested in Phase II instead of Nolan's company IH Riverdale, LLC ("IH"). Nolan and IH brought suit against McChesney and others for breach of the right of first refusal and, among other things, for breach of contract for failure to pay a five percent "guaranty profits distribution" provided in the parties' Phase I agreement. The defendants counter-claimed. The parties filed cross-motions for summary judgment on numerous issues, which the court granted in part and denied in part. Only Nolan and IH have appealed, and essentially, they raise only two issues: that the trial court erred by granting summary judgment to the defendants rather than to Nolan and IH on the right of first refusal; and that the trial court erred by denying summary judgment to IH on the issue of the five percent profits distribution.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

1. On the trial court's decision to grant McChesney Capital Partners, LLC's ("MCP") motion for summary judgment and to deny IH's on the right of first refusal, with only a few exceptions, the relevant facts are undisputed. The evidence shows that in early 2002, IH and MCP entered into an agreement to develop Phase I. One provision of the agreement gave IH the right of first refusal to participate as an investor in the development Phase II. Specifically, the agreement provides as follows:

> . . . [MCP] and IH agree that [MCP], or its affiliates, shall give IH the first right of refusal to invest in the Second Phase. If IH elects to invest, IH shall have the right to invest from twenty-five percent up to fifty percent of the capital and receive its proportionate share of profits and losses and

[MCP] shall invest the balance, from fifty to seventy-five percent of the capital and receive its proportionate share of profits and losses, provided both Nolan and [MCP], or related affiliates, are guarantors on the Second Phase. . . .

The agreement does not provide a time limitation in which IH must respond to an offer of the right of first refusal. But the agreement does provide that "[t]ime is of the essence of this agreement."

On Wednesday March 12, 2003, by overnight delivery, Nicholas Walldorff of MCP sent Nolan a letter offering IH its right of first refusal to invest in Phase II; MCP gave IH seven days to respond. The letter stated that MCP was proceeding with Phase II and that another investor had agreed to the terms shown on the attached "preliminary term sheet." It then presented the offer and specified that IH respond by March 19 on a return copy of the letter "[g]iven the tight closing schedule":

I have attached for your information the preliminary term sheet for investment in the Second Phase of the project, and we have another investor who has agreed to these terms, subject to your right of first refusal under Section 5.11 (e) of the Riverdale Operating Agreement. As we anticipate closing this investment on or about April 1, 2003, please indicate on the attached page whether IH Riverdale intends to exercise its right of first refusal and invest in the project on the terms set forth in the attached term sheet. Given the tight closing schedule, we would request that you notify us of your intentions by returning a copy of this letter (with the attached page completed and signed) no later than March 19, 2003.

The second page of the letter stated that Nolan should check one of two sentences in order to indicate whether he intended to "exercise [IH's] right of first refusal . . . and agree[ ] to the investment terms set forth on the attached term sheet"; and it had a place for Nolan's signature.

The attached "preliminary term sheet" was dated March 11, 2003, and among other things it indicated a "Proposed Investment Amount" of $1,150,000, a "development fee" of $300,000 for an MCP affiliate, and payment of a "cumulative non-compounding rate of return equal to 6.5% per annum" to the investors, namely IH and MCP. As quoted above, the letter indicated that another investor had agreed to these same terms.

But MCP had delivered a not quite identical term sheet to Schejola Partners, LP, also dated March 11, 2003. In McChesney's

deposition he twice stated that the same terms were offered to Schejola and IH, but Schejola's term sheet indicated a "Proposed Investment Amount" of $1,000,000 and no development fee for an MCP affiliate. It did, however, provide the same 6.5 percent return for the investors.

On March 20, 2003, one day after the requested response time, Nolan faxed a letter to MCP. In the letter, Nolan stated that IH was "interested" in pursing the investment:

> We have received the summary letter of the investment proposal for Phase II. In essence, IH Riverdale is interested in pursuing an equity investment of between 25% and 50% of the $2,300,000 total equity requirement, along the general terms as outlined in your letter of March 12, 2003.

Nolan then continued, "However, many questions and issues remain to be clarified before investment documents could be signed; most of these should be answerable in the previously requested meetings." And he closed with, among other things, "I look forward to hearing from you soon and a continuation of our relationship." But Nolan did not return page 2 of the letter signed and marked as requested.

On March 21, the next day, McChesney sent an email to Nolan and stated that Nolan had failed to respond in the time allotted, although McChesney mistakenly referred to the allotted time as ten days. On the following day, Nolan replied by email in an attempt to clarify that he was accepting the offer:

> In all candor, I responded within 8 days of the date of the "offer" of first refusal, and within 7 days of receipt of the offer (received on the 13th). I responded before expiration of a "10" day period. I also said that I would accept the offer as presented in your correspondence. . . . [W]e are still planning to invest along the terms of the offer sheet, as we have responded.

On April 3, 2003, MCP closed the investment with Schejola. The final agreement with Schejola provided a 7.5 percent annual rate of return to Schejola, as opposed to the 6.5 percent rate provided in the March 11, 2003 term sheets. And, MCP asserts, under the final agreement, Schejola agreed to pay the $300,000 development fee.

In the order on the motions for summary judgment, the trial court held that IH failed to respond in time to the offer under the right of first refusal, and that when it did, it did not accept unequivocally, therefore it failed to exercise the right. IH contends the trial court erred for three reasons: (1) IH was never obligated to respond because

MCP never offered IH the same terms accepted by Schejola; (2) IH was not obligated to respond within the unilateral, unreasonable deadline requested by MCP; and (3) IH accepted the purported offer within a reasonable time. MCP, on the other hand, agrees with the trial court's reasoning, and it also asserts that the right of first refusal is not enforceable because it lacks a triggering term. See *Booker v. Hall*, 248 Ga. App. 639 (548 SE2d 391) (2001).

(a) *Booker* is inapplicable here because MCP clearly understood that the right of first refusal had been triggered. See OCGA § 13-2-4 (2005) ("[T]he meaning placed on the contract by one party and known to be thus understood by the other party at the time shall be held as the true meaning."); *M.W. Buttrill, Inc. v. Air Conditioning Contractors*, 158 Ga. App. 122 (1) (279 SE2d 296) (1981) (indefinite contract can become definite and enforceable through the subsequent acts, words, and conduct of the parties); *Rollins v. Gault*, 153 Ga. App. 781, 782 (266 SE2d 560) (1980) (evidence may be received to aid in the interpretation of an ambiguous right of first refusal).[1]

(b) The second issue is whether IH was offered the same terms as Schejola, and if not, whether any differences were material.

"A right of first refusal is a preemptive right; it sets a requirement that when the owner decides to sell, the person holding the right of first refusal must be offered the opportunity to buy." (Footnote and emphasis omitted.) *Studio X, Inc. v. Weener, Mason & Nathan*, 276 Ga. App. 652, 654 (624 SE2d 157) (2005). "In exercising a right of first refusal, the holder of the right is empowered to contract 'at the same price and upon the same terms and conditions' as those contained in a bona fide third-party offer. *Shiver v. Benton*, 251 Ga. 284, 288 (304 SE2d 903) (1983)." *Bouy, Hall & Howard & Assoc. v. Savannah Airport Comm.*, 256 Ga. 181, 181-182 (1) (345 SE2d 349) (1986). See also Corbin on Contracts, § 11.3. If the offers were in fact different, whether the difference in terms is material is determinative. See

---

[1] Furthermore, we question the apparent literal meaning of the holding in Division (1) (a) of *Booker* – for which there is no cited authority on point – that a right of first refusal that lacks a triggering term is not enforceable. See *Booker*, 248 Ga. App. at 642 (1) (a). The courts of this state have frequently been asked to determine whether a certain event triggered a right of first refusal in agreements in which the triggering term did not specifically address the circumstances that arose. See, e.g., *Hornsby v. Holt*, 257 Ga. 341, 343 (2) (359 SE2d 646) (1987) (finding that exercising a power of sale in a security deed constituted a trigger of a right of first refusal that was triggered by the property owner electing to sell). See also *Hasty v. Health Svc. Centers*, 258 Ga. 625, 626-627 (373 SE2d 356) (1988) (holding that granting an option to purchase constituted a trigger); *Schoenbaum Ltd. Co. v. Lenox Pines, LLC*, 262 Ga. App. 457, 465-466 (5) (a) (585 SE2d 643) (2003) (finding a question of fact as to whether a certain event triggered a right which stated that it was triggered when one party " 'elects not to develop the property' "); *Tachdjian v. Phillips*, 256 Ga. App. 166, 170-171 (568 SE2d 64) (2002) (remanding for a jury determination, but not holding unenforceable, a right of first refusal where there was no triggering term).

*Shiver v. Benton*, 251 Ga. at 288-289 (2) (immaterial difference in terms did not mean that holder of right of first refusal had failed to perform); *Interfinancial Properties v. Mary T. Cristal Trust*, 254 Ga. App. 406 (562 SE2d 757) (2002) (two material differences between proposed contracts meant contracts were not "identical" as required by agreement). See also *Systems Engineering Assoc., Investigation Div. v. Peachtree Corners, Inc.*, 179 Ga. App. 48, 50 (345 SE2d 136) (1986) (where differences between two offers did not affect the purchase price of the property, the two offers were seen as being "consistent" with each other, and the differences were without legal significance).

IH alleges there were two material differences between the offers when they were made: that the IH offer specified an investment amount of $1,150,000 whereas the Schejola offer specified $1,000,000; and that the IH offer included a $300,000 fee to be paid to an MCP affiliate that the Schejola offer did not include.[2] Pretermitting whether the difference in investment amount was legally significant, the second point raises an issue of fact. Although MCP testified that Schejola had agreed to the exact same terms as those offered to IH, the two "preliminary term sheets" are in fact different on this point. And a $300,000 difference would be material. Because there is an issue of fact as to whether IH was offered the same terms as Schejola, summary judgment was not warranted for either party.

(c) The agreement between the parties provides that time is of the essence but it does not provide a time in which IH had to respond to any offer made pursuant to the right of first refusal. When a contract is missing a term indicating the time for performance, a reasonable time for performance will be implied. *Read v. GHDC, Inc.*, 254 Ga. 706 (334 SE2d 165) (1985); *Miller v. McCullough*, 236 Ga. 666, 667-668 (4) (224 SE2d 916) (1976); *Torgesen v. Torgesen*, 274 Ga. App. 298, 300-301 (1) (617 SE2d 223) (2005). This is so even if the contract has a time-is-of-the-essence provision. See *Hopper v. M & B Builders, Inc.*, 261 Ga. App. 702, 706 (4) (583 SE2d 533) (2003) (without a specified date, no charge on time of the essence was warranted even though there was such a provision in the agreement).[3] Furthermore, an attempt to impose a time limitation where

---

[2] IH also points out that the final Schejola agreement included a 7.5 percent rate of return for the investors whereas IH had been offered only 6.5 percent. But we find no authority for the principle that a right of first refusal requires the final terms of the transaction to match those initially offered by both parties pursuant to the right of first refusal. See *Bouy, Hall &c.*, 256 Ga. at 182 (1). And, here, both Schejola and IH were initially offered a 6.5 percent rate of return. Likewise, MCP's argument that Schejola ultimately agreed to pay the $300,000 fee to an MCP affiliate is irrelevant to the question of whether IH was offered the same terms as those *offered* to Schejola.

[3] It follows that we need not be concerned with whether a right of first refusal once

none existed before or where one has been waived must also be reasonable. See generally *Belk v. Nance*, 232 Ga. 264, 267 (3) (206 SE2d 449) (1974); *Boswell v. United States*, 123 F2d 213, 215 (5th Cir. 1941) (applying Georgia law). Compare *Spivey v. Rogers*, 249 Ga. 179, 180 (288 SE2d 555) (1982) (although strict compliance with original deadline had been waived, missing new deadline by almost two months constituted a failure to perform).[4]

Generally, what is reasonable time is a question of fact for the jury. *Crooks v. Chapman Co.*, 124 Ga. App. 718, 719 (2) (185 SE2d 787) (1971). In this case there is an issue of fact as to whether the deadline imposed by MCP was reasonable under the circumstances. We cannot say as a matter of law that seven days either was or was not reasonable under the circumstances. There is also an issue of fact as to whether IH clearly and unequivocally accepted within a reasonable time.

2. The trial court also denied IH's motion for summary judgment on its claim that it was entitled to a five percent quarterly distribution of profits under the Phase I agreement. IH enumerates this decision as error. MCP asserts that the Phase I agreement was amended to confirm that the distribution was terminated.

The Phase I agreement provides that quarterly distributions of "distributable cash" shall be made on the following basis: 5 percent to IH as its "guaranty 'profits' distribution," 5.32 percent to IH, and 89.68 percent to McChesney:

> Any Distributable Cash from any event other than a Capital Event and after payment of any accrued and unpaid one percent guaranty fee pursuant to Section 5.11 (f) shall be distributed to the Members, on a quarterly basis, five percent (5%) to IH as its guaranty "profits" distribution, five and thirty-two hundredths percent (5.32%) to IH and eighty-nine and sixty-eight hundredths percent (89.68%) to McChesney. Such distributions, excluding the guaranty "profits" distribution received by IH, shall be applied to reduce the accrued but previously unpaid Preferred Return. . . .

But amendments to the agreement were authorized if they were "in writing and signed by the Members holding at least a Majority

---

triggered, becomes an option contract for which time is of the essence as a matter of law. See *Belk v. Nance*, 232 Ga. 264, 266 (2) (206 SE2d 449) (1974).

[4] We also note that MCP's March 12, 2003 offer contains language that could be read to mean that the seven-day deadline was not mandatory. MCP wrote, "Given the tight closing schedule, we *would request* that you notify us of your intentions . . . no later than March 19, 2003."

Interest in the Company." And a "Majority Interest in the Company" was defined in the agreement as "Ownership Interests of Members which, taken together, shall exceed eighty percent . . . of the aggregate of all the Ownership Interest of the Members." MCP owned 94.68 percent of the Ownership Interests in the venture. And, on July 11, 2003, MCP voted to amend the agreement between the parties. The amendment deleted all references to the five percent fee payable to IH.

IH has failed to explain why it should be entitled to the five percent fee given that the agreement was amended to eliminate the fee. For that reason alone, the trial court did not err by denying IH's motion for summary judgment on this issue.

*Judgment affirmed in part and reversed in part. Blackburn, P. J., and Mikell, J., concur.*

DECIDED JUNE 20, 2006 — 

*Hartman, Simons, Spielman & Wood, David L. Pardue*, for appellants.

*Bondurant, Mixson & Elmore, Jill Pryor, George N. Sparrow, Jr.,* for appellees.

A06A0708. LUONG v. TRAN et al.
(633 SE2d 797)

RUFFIN, Chief Judge.

Following the death of Kiet Van Le ("Le"), Mai Luong filed a wrongful death suit against T & S Natural Resources, LLP ("T & S"), the company that owned the property where Le had been shot.[1] T & S moved for summary judgment, asserting inter alia that it did not have the superior knowledge needed to impose liability. The trial court granted the motion, and this appeal ensued. Finding no error, we affirm.

1. As a threshold matter, we must discuss Luong's failure to adhere to this Court's rules. In particular, Luong violated the rule

---

[1] Luong filed suit both individually and as next friend to Le's children, including counts for wrongful death and public nuisance. Although the trial court granted summary judgment on the nuisance claim, Luong does not challenge this ruling on appeal. Accordingly, we do not address this issue. In addition to T & S, Luong sued Tan Trung Tran, whom Luong alleges operated the bar/restaurant where Le was shot. As Tran is not a party to this appeal, we refer solely to T & S.