**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**October 30, 2014**

# In the Court of Appeals of Georgia

A14A1236. EFFINGHAM COUNTY v. ROACH.

BRANCH, Judge.

Effingham County appeals the denial of its second motion for summary judgment in this breach of contract action brought by Benjamin R. Roach, Chapter 7 Bankruptcy Trustee for Darrell Morgan. The County applied to this Court for interlocutory appeal, and this Court granted the application, holding that because the trial court rendered a conclusive determination on an issue of sovereign immunity, the trial court's order was directly appealable as a collateral order.[1] For the following reasons, we affirm the denial of summary judgment.

---

[1] The collateral order doctrine allows direct appeals of interlocutory rulings that deny motions to dismiss based on conclusive determinations that the State or a state officer or employee is not immune from suit based on sovereign immunity. *See Board of Regents v. Canas*, 295 Ga. App. 505, 507 (1) (672 SE2d 471) (2009).

To prevail on a motion for summary judgment,

> the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

*Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006) (citations omitted). We therefore view the evidence in the light most favorable to Roach/Morgan.

*Background*

So viewed, the record shows that in early 2005, Morgan became interested in purchasing and developing a 75-acre sub-tract of an over 500-acre parcel of property in Effingham County known as Grandview (a/k/a Mill Creek). Morgan contacted the County to determine whether it would provide water and sewer utilities ("w/s") to the property and whether it would be open to re-zoning the property for residential development. David Rutherford, the County Administrator, and Hubert Sapp, the County Board Chairman, told Morgan that the County would be providing w/s to the property, and County officials supported the re-zoning. Morgan approached the Bank

2

of Newington to obtain financing to purchase the property, and the bank agreed to finance the purchase if Morgan could provide it with, among other things, a letter of intent from the County committing to supply w/s.

On March 1, 2005, the County Board of Commissioners provided a letter of intent regarding providing w/s to the property in which the County specified that a final water and sewer agreement would be necessary to work out details; in the letter, the County stated that "[a]t this time, it is projected that water and sewer service can be available to the site by July 2006." Morgan then entered into a contract to purchase the property,[2] received financing from the bank based on the letter of intent, and closed on the property on July 18, 2005. The County approved the re-zoning in October 2005. Also in October, at the County's request, Morgan provided a copy, and later delivered the original, of a $500,000 letter of credit made in favor of the County and the Georgia Environmental Finance Authority (GEFA), the agency from which the County hoped to obtain loans to finance its projects. The County's consulting engineer, James Vaughn, testified that it should have taken eight months or so from

---

[2] The larger portion of the property was purchased by the Old Augusta Development Group (OADG), and a third, smaller portion was purchased by Gregg Howze (Howze was a member of OADG but purchased another parcel in his individual capacity).

3

the time that the project was bid to complete the County's portion of the infrastructure, which consisted of a six-mile extension of County infrastructure, and that the July 2006 projection was reasonable at that time.

*2005 Development Agreement*

At the November 1, 2005 County Board of Commissioners meeting, the board authorized the County to enter into a w/s development agreement with Morgan. The parties thereafter executed a "Development Agreement" dated November 1, 2005. The agreement required Morgan to construct the on-site w/s infrastructure and the County to construct the off-site w/s infrastructure; upon completion, Morgan was required to dedicate the on-site lines to the County. The Agreement was made "[s]ubject to the condition that funds be made available to the County by [GEFA] for the construction of the County water, reuse water and wastewater treatment system up to and includ[ing] the connection point," and it required Morgan to provide a $2.5 million letter of credit in favor of the County and GEFA.[3] The parties did not include a deadline for completion of the construction of the w/s services in this contract.

---

[3] The County claims the letter of credit was never delivered. Roach claims that Morgan fulfilled this requirement with the letter of credit that Morgan had already given the County in October that enabled it to obtain a GEFA loan. And at the board meeting, the County Administrator noted that "we do have a letter of credit from Mr. Morgan for $500,000."

4

*2006 Agreement*

Six months later, on May 10, 2006, the County board of commissioners again met and discussed the provision of w/s to Grandview. The board voted to revoke "any prior agreements with Grandview" and to "approve the [w/s] agreement with Grandview." On that same day, the County and Morgan executed the "Water, Sewer, and Re-Use Water Service Agreement" ("2006 Agreement"). Like the earlier agreement, this agreement required Morgan to construct on-site w/s infrastructure (which he would later dedicate to the County) and the County to construct off-site w/s infrastructure into which Morgan would tie the on-site lines. With regard to the County's primary obligation, the agreement provides that

> The County has constructed or will construct a water system having sufficient capacity to provide potable water to the Project, a sewage system having sufficient capacity to treat effluent from the Project, and a re-use water distribution system having sufficient capacity to deliver irrigation water to the Project, as shown on the [attached plans].

The agreement then provides that the County's obligation is subject to GEFA providing funds, but the deadline clause for the County's primary obligation contains two blanks:

5

Subject to the condition that funds be made available to the County by [GEFA] or from other sources for the construction of [w/s to Grandview], the County shall ensure the availability of [w/s to Grandview] not later than _____, 2006, provided that the County shall not be liable to the Developer for consequential damages or economic losses in the event that availability of any or all of said services is delayed. If [w/s] services are not available at the connection point not later than _____, the County agrees to and does hereby assign to Developer any delay damages . . . due to the County from its contractors responsible for the timely construction of [w/s] up to and including the connection points.

The parties never filled in these blanks.

The contract also required Morgan to provide a $499,500 letter of credit in favor of the County to secure a guarantee in the same amount of w/s "impact" or connection fees to be generated by the project; the contract specified that the letter of credit was required as a condition precedent to the County's obligations under the contract. Accordingly, Morgan submitted a second $500,000 letter of credit in favor of the County and GEFA on May 16, 2006. Other provisions of the contract required Morgan to make annual payments for any shortfalls in the collection of impact fees from the future homeowners, which were designed to assist the County in recovering

6

the cost of constructing the w/s systems for Grandview.[4] The agreement also provided for severability in case any of its provisions should be held invalid and that its terms constituted the entire agreement between the parties. Finally, the agreement provides as follows:

> The failure of either party to the Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be construed as thereafter waiving any such terms and conditions, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

*Delays by the County to Provide W/S*

Meanwhile, and soon after the County and Morgan had executed the 2005 Development Agreement, the City of Rincon became interested in providing w/s to the Grandview property in order to obtain more w/s customers and to avoid being prevented from expanding its lines in the future by an extension of the County's infrastructure. In January or February 2006, at the County's request, Morgan and

---

[4] Effingham County has used an almost identical contract in other transactions, one of which formed the basis of a breach of contract claim by the County against a developer who failed to pay the impact fees. *Effingham County v. Park West Effingham*, 308 Ga. App. 680 (708 SE2d 619) (2011).

representatives of the OADG attended a meeting that did not include any officials from Rincon, at which the County urged the developers to have Rincon provide w/s instead of the County. At the meeting, Morgan objected to Rincon providing w/s because Rincon did not have sufficient capacity; County officials then assured Morgan that the County would provide w/s as previously promised. Thereafter, Morgan never attended a meeting with any Rincon officials. Unbeknownst to Morgan, the County thereafter continued to discuss substituting Rincon as the w/s provider, and pushed OADG to meet with Rincon officials, which OADG did repeatedly.[5] By about February or March 2006, the Georgia Environmental Protection Division (EPD) had approved the County's plans for many of the projects funded by the applicable GEFA loans, which was supposed to include Grandview, but no plans for the Grandview project had been submitted to the EPD for approval by the County. The County's consulting engineer, Jim Vaughn, testified that the ongoing Rincon discussions might have been a factor in the delay. The County Administrator testified that the Grandview project had been put on hold in connection with the idea that

[5] There appears to be a question of fact as to whether, at least to some degree, Morgan relied on OADG to represent him in connection with developing his portion of the greater property. For example, both portions of the property were rezoned simultaneously, someone other than Morgan submitted his requests for rezoning, and Morgan admitted that he did not attend several rezoning meetings.

8

Rincon serve the project instead of the County. And in a July 10, 2006 e-mail to the County, Vaughn stated, "We understand the Grandview project is currently on hold. We will stop work on the project until conversations with the City of Rincon have been completed by the County." County Administrator Ed Williams responded, "Jim, Please do NOT mention holding up the Grandview project!!!."

Recordings and transcripts of County Board of Commissioners meetings throughout the spring of 2007 show that the commissioners and OADG continued to discuss the possibility of Rincon providing w/s for Grandview; engineers and commissioners working with the County testified that continuing delays in designing the w/s infrastructure resulted, at least in part, from these negotiations. As of late December 2007, a status report prepared by the County Administrator and sent to the commissioners referred to Rincon negotiations as occurring "over the last three months." Morgan testified that he was never made aware of the continuing Rincon discussions or that those discussions were delaying the w/s project. Nevertheless, Morgan states in his brief that the "hold" was lifted on June 5, 2007.

During this same time frame, Old Augusta Road, the proposed route of the w/s services from the county, was being realigned in such a way as to prevent the extension of County w/s to Grandview until completion of the road work; the road

9

project itself was delayed for a number of reasons for a year and a half. Morgan became aware of the DOT-related delays possibly as early as 2007. Morgan was told that the County was not going forward until the DOT completed the road work.

In early 2008, due to the delay and changes in the economy, Morgan elected to have the property re-zoned for industrial use, and the County granted his re-zoning application on July 14, 2008; the re-zoning documents again stated that w/s would be provided by the County, and they noted a new, reduced level of w/s demand for the industrial property. But Morgan never provided the County with new projected capacity needs for the industrial property, which were necessary to design the infrastructure properly. Later in 2008, the County removed the Grandview w/s project from the scope of work planned for the existing GEFA funding, although the County still held two letters of credit from Morgan and never told him that his project was no longer within the scope of the GEFA funding.

During the entire time from the 2006 Agreement forward, Morgan never started work on his property. He testified that he did not want to risk starting without assurance that the County w/s was coming. Morgan began to express his frustration to County officials starting in November 2006. But in each conversation, County officials reassured him that the w/s project was coming. Morgan testified that he did

10

not take any action because "I guess I had faith in them. They kept telling me they was going to bring water and sewer and I kept believing them to the last minute." He also testified, that the idea of suing the County was probably mentioned "sometime pretty shortly after the middle of '06 when we didn't have anything happening." He added,

> I started thinking about what are we going to do, and decided to keep trying. I was all in, stay in. Stay in. Stay in. They kept telling me they were going to bring it, so I kept making interest payments. . . . I probably was thinking about [suing in the 2006, 2007 time frame] but decided against it. It's kind of early back then. You know. July of '06, they said it would be available but it also says it's projected. I mean, you know, this is you in the real world, things don't always happen when they are projected to happen. I didn't want to bail out on them, they are telling me it's coming. So, you know, let's make another payment [on the purchase money loan for the property]. . . . Never once in my recollection any time did they say they were not going to run the water and sewer line. Never when I talked to them did they tell me they wouldn't.

Finally, he testified,

> When [the bank] foreclosed on me [in November 2009] and I was out of the game[,] I felt like I was wronged. Until [the bank] foreclosed [the County was] going to bring [w/s], they kept saying they were going to bring it. And I still believe had they brought it, I could have sold it.

11

*Bankruptcy and Litigation*

Morgan filed for Chapter 11 bankruptcy in the summer of 2009, his bankruptcy was converted to Chapter 7 in February 2010, and he was eventually discharged on January 7, 2011. Meanwhile, in November 2009, the bank obtained relief from the automatic stay and foreclosed on the property. Roach gave *ante litem* notice on September 29, 2010, and filed suit against the County and the County Board of Commissioners on December 22, 2010, setting forth claims for breach of contract, promissory estoppel, negligent and false misrepresentation, and punitive damages.[6]

The defendants moved for summary judgment on July 16, 2012. The trial court granted the motion in part, disposing of all claims against the individually-named defendants, but denied summary judgment with respect to the breach of contract and promissory estoppel claims against the County. Roach then voluntarily dismissed without prejudice his promissory estoppel claim against the County, and the County

---

[6] Roach later amended his complaint twice and added individual County commissioners as defendants. The Second Amended Complaint added claims for negligence and fraud, and dropped the claim of fraudulent misrepresentation. Roach subsequently voluntarily dismissed without prejudice his claims against the County for negligent misrepresentation, negligence, punitive damages, and fraud. A consent order dismissed the board of commissioners as a defendant.

filed a notice of appeal to this Court. We dismissed the County's appeal for failure to follow the interlocutory appeal procedures set forth in OCGA § 5-6-34 (b).

After remand, the County again moved for summary judgment on the breach of contract claim, reasserting the grounds asserted in the first motion – invalidity of the contract, failure of any other documents to give rise to contractual obligations, failure to make a valid damages claim, failure to mitigate damages, and failure to provide timely *ante litem* notice – and also arguing that sovereign immunity barred the breach of contract claim against the County. The trial court, noting that the motion was nearly identical to the first motion, incorporated by reference the findings of fact from its first order and denied the County's second motion for summary judgment on all grounds. This appeal ensued.

1. The County contends the trial court erred by denying its motion for summary judgment on Roach's claim of breach of contract for several reasons. We find no error.

(a) The County first argues that 2006 Agreement is void and unenforceable based on the County's reading of a related decision of this Court and that the trial court erred by failing to so hold. As shown above, in a separate transaction, the County used a similarly-worded agreement, and in *Park West*, this Court held that a

13

provision of that agreement, which provided that the developer was required to pay impact fees prior to the issuance of a building permit, violated the terms of OCGA § 36-71-4 (d)[7] of the Georgia Development Impact Fee Act, OCGA § 36-71-1 et seq. and was therefore void. See *Park West*, 308 Ga. App. at 684.

Regardless whether the "impact fee" clause of the 2006 Agreement violates a statute or public policy, the remainder of the agreement is enforceable if the void provision is severable. See *Nolley v. Maryland Cas. Ins. Co.*, 222 Ga. App. 901, 904 (4) (476 SE2d 622) (1996). "A contract may be either entire or severable. In an entire contract, the whole contract stands or falls together. In a severable contract, the failure of a distinct part does not void the remainder." OCGA § 13-1-8 (a). "The character of the contract in such case is determined by the intention of the parties." OCGA § 13-1-8 (b). Where a contract specifically provides for severability, the language is "a clear and enforceable expression of the intent of the parties to render the contract severable." *Circle Appliance Leasing v. Appliance Warehouse*, 206 Ga.

_____

[7] OCGA § 36-71-4 (d) provides in pertinent part as follows:

A municipal or county development impact fee ordinance shall provide that development impact fees shall be collected not earlier in the development process than the issuance of a building permit[.]

14

App. 405, 406 (1) (425 SE2d 339) (1992) (citation omitted). See also *Bulloch South, Inc. v. Gosai,* 250 Ga. App. 170, 175 (1) (b) (550 SE2d 750) (2001) ("The parties' intent may be expressed directly, through a severability clause.") (punctuation and footnote omitted).

Here, the 2006 Agreement specifically provides that invalid or unenforceable parts of the agreement are severable:

> In the event that any part or subpart of this Agreement is held to be invalid or unenforceable by any court of competent jurisdiction, the parties agree that the remaining provisions shall be deemed to be in full force and effect.

The same agreement contains several promises by each party other than the promise to pay impact fees. For example, the County agreed to construct the w/s systems and to ensure the availability of potable water, reuse water and wastewater services to Grandview; Morgan promised to construct the on-site improvements in compliance with all County design and construction requirements and to dedicate those

15

improvements to the County. It follows that these other obligations, including the County's obligation to provide w/s to Grandview, are severable.[8]

In sum, the trial court did not err by concluding that the County's obligation to provide w/s under 2006 Agreement is not affected by this Court's decision in *Park West*.

(b) The County next contends that Roach's claim of breach of contract is barred by sovereign immunity. The County argues that although its sovereign immunity is waived for contract actions, Roach failed to identify any valid written contract upon which to base a breach of contract claim and that, therefore, Roach's claim against the County does not arise in contract. See Ga. Const. of 1983, Art. I, Sec. II, Para. IX (c) (state constitution waives sovereign immunity in "any action ex contractu for the breach of any written contract"); *Board of Regents v. Ruff*, 315 Ga. App. 452, 455 (2) (726 SE2d 451) (2012) (no waiver of sovereign immunity where plaintiff failed to prove a written contract with board of regents). But our holding in Division (1) (a)

---

[8] Moreover, *Park West* is distinguishable. In *Park West*, the County was attempting to enforce the very provision of the agreement that was held to be void and invalid, and *Park West* did not address severability, nor mention whether the agreement had a severability clause. In the case before us, Roach has sued for breach of the County's obligation to provide w/s to Grandview and the allegedly void provision of the agreement is severable.

defeats the County's argument. Because the County does not challenge the enforceability of the 2006 Agreement on any other grounds and because the 2006 Agreement is not void based on the *Park West* argument, Roach has a claim based on that agreement.[9] Accordingly, the County's assertion of sovereign immunity is without merit.

(c) The County also moved for summary judgment on the ground that Roach cannot establish damages, an essential element of a breach of contract claim. See generally *Budget Rent-a-Car of Atlanta v. Webb*, 220 Ga. App. 278, 279 (1) (469 SE2d 712) (1996) (elements of breach of contract are "the breach and the resultant damages to the party who has the right to complain about the contract being broken") (citation and punctuation omitted). Roach seeks damages for the claim of breach of contract. Breach of contract damages include "all damages as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach."

---

[9] In its statement of facts, the County asserts in a parenthetical that the 2006 Agreement "was nullified when Mr. Morgan drastically reduced the capacity needs for the property by rezoning it." The County does not elaborate on this argument in its discussion nor cite any authority in support. This argument is therefore unavailing. See *Kuehn v. Key*, 325 Ga. App. 512, 519 (3) (754 SE2d 103) (2014).

OCGA § 13-6-2. The County's only argument on appeal regarding damages, however, is that the 2006 Agreement specifically precluded any claim for consequential damages or economic losses arising from delayed performance.

The clause of the agreement that addresses damages resulting from delays has two parts. It first precludes *any damages* resulting from delay caused by a force majeure, which is not an issue here.[10] The clause also precludes any liability on the County for "consequential damages or economic losses" caused by delay:

> In no event shall the County be held liable to the Developer for consequential damages or economic losses arising from delayed performance; provided, however, that in the event the County fails to timely perform its obligations under this Agreement after written notice of default from the Developer, then Developer shall be entitled to

---

[10] The first clause provides as follows:

Neither the County nor Developer shall be liable to the other or any successor in interest for any loss, cost, or damage arising out of, or resulting from, non-performance or delayed performance of the terms of this Agreement where such non-performance or delayed performance is the result of circumstances or occurrences beyond the reasonable control of the responsible party (each, a "force majeure"), which, as used herein, shall be deemed to include, non-performance or delayed performance resulting from acts of God, strikes, lockouts, blockades, insurrections, riots, explosions, fire, floods, or any other cause not within the reasonable control of the responsible party.

complete the County's construction obligations hereunder, and, if Developer undertakes to and does complete all or a portion of the County's construction obligations hereunder, . . . [Developer shall] be entitled to a credit for the cost of such completion against the water, sewer, and re-use impact and capacity fees otherwise payable under this Agreement. [11]

It is undisputed that Morgan never gave notice of default to the County as required under this second clause and never attempted to complete the County's obligations to provide off-site w/s services.

In Georgia, "termination or no-damage clauses will not be applied to delays or their causes not contemplated by the parties." *Dept. of Transp. v. Arapaho Const.*, 257 Ga. 269, 270 (357 SE2d 593) (1987) (citations omitted). Furthermore, "such provisions . . . must be clear and unambiguous, [and] specific in what they purport to cover." Id. (citations and punctuation omitted). Here, Roach has presented evidence suggesting that the delay in providing w/s to Grandview was caused, at least in part, by the County's protracted discussions with the City of Rincon about which governmental entity was going to provide w/s to Grandview, despite the fact that the

---

[11] The contract made the same point in another section where it provides that "the County shall not be liable to the Developer for consequential damages or economic losses in the event that availability of any or all of said services is delayed."

County had already entered into an agreement to provide those services, and that Morgan was not aware of this continuing discussion. The no-damages-for-delay clause does not specify this type of delay. As the trial court held, therefore, there is an issue of fact for the jury as to whether the parties contemplated such a delay and, therefore, an issue about the enforceability of the clause precluding recovery of consequential damages or economic losses.

The County argued below that Roach cannot establish any damages other than consequential damages[12] or economic losses arising from delayed performance. On appeal, however, the County makes no argument regarding any other type of damages. Although Roach has not specified the precise damages he seeks, we note that diminution in value of the property has long been considered "an element in determining the proper measure of damages to real property." *Royal Capital Dev. v. Maryland Cas. Co.*, 291 Ga. 262, 264-265 (1) (728 SE2d 234) (2012). And we agree with the trial court that, at a minimum, there is an issue of fact in this case as to damages for diminution in value.

---

[12] Consequential damages are defined as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act." Black's Law Dictionary (9th ed. 2009).

In sum, the County has not shown that the trial court erred by refusing to grant summary judgment based on the argument that the terms of the parties agreement precluded a claim for damages resulting from delay or that Roach can show no other damages.

(d) Fourth, the County contends Roach's claims are time barred because Roach failed to give timely *ante litem* notice as required by statute. OCGA § 36-11-1 provides that "[a]ll claims against counties must be presented within 12 months after they accrue or become payable or the same are barred." The County argues that Roach's claim accrued at the end of 2006 in accordance with the 2006 Agreement which provided that "the County shall ensure the availability of [w/s to Grandview] not later than _____, 2006," and, therefore, Roach's *ante litem* notice on September 29, 2010, was untimely. Roach argues that Morgan only became aware that he might have a claim against the County when the property was foreclosed upon in November 2009, that the County committed a separate breach in March 2009 when it removed Grandview from the "Phase II" projects list, and that the County's efforts to conceal "holds" on the project tolled any *ante litem* requirements.

In general, a claim for breach of contract accrues at the time of the breach, not at the time that damages are discovered. *Gamble v. Lovett School*, 180 Ga. App. 708,

21

710 (350 SE2d 311) (1986); *R. L. Sanders Roofing Co. v. Miller*, 153 Ga. App. 225, 226 (1) (264 SE2d 731) (1980).

> [T]he true test to determine when the cause of action accrued is to ascertain the time when the plaintiff could first have maintained his action to a successful result. Actual damage is not essential, but the right of action has its inception upon the breach of duty.

*Gamble*, 180 Ga. App. at 710 (citation and punctuation omitted). Thus, the date when Morgan subjectively became aware that he might have a claim, as the trial court appears to have held, is not controlling. Rather, the issue turns on when, under Roach's version of the facts, the County breached the 2006 Agreement to provide w/s to Grandview.

The 2006 Agreement provided that "the County shall ensure the availability of [w/s to Grandview] not later than _____, 2006." It also provides that

> If [w/s] services are not available at the connection point not later than _____, the County agrees to and does hereby assign to Developer any delay damages . . . due to the County from its contractors responsible for the timely construction of [w/s] up to and including the connection points.

The blanks in the contract require this Court to construe the contract and, if necessary, consider parol evidence to determine the parties' intent:

22

When a written contract or agreement appears to be incomplete, or its terms inconsistent with one another, it is the duty of the trial court to construe that contract or agreement, OCGA § 13-2-1, applying the rules of construction set forth in OCGA § 13-2-2. Where the writing is incomplete on its face, parol evidence is admissible to assist in determining the parties' intent.

*Pounds v. Hosp. Auth. of Gwinnett County*, 191 Ga. App. 689, 693 (2) (382 SE2d 602) (1989) (citations omitted). One applicable rule of construction is that when parties fail to specify a time for completion, the law implies a reasonable time based on all the facts and circumstances of the case. *Mansell 400 Associates, L. P. v. Entex Information Svcs.*, 239 Ga. App. 477, 480 (4) (519 SE2d 46) (1999); *Smith v. Cowart*, 75 Ga. App. 268, 272-273 (1) (a) (43 SE2d 196) (1947). What constitutes a reasonable time is, in general, a question of fact for the jury. *IH Riverdale, LLC v. McChesney Capital Partners, LLC*, 280 Ga. App. 9, 14 (1) (c) (633 SE2d 382) (2006); *Crooks v. Chapman Co.,* 124 Ga. App. 718, 719 (2) (185 SE2d 787) (1971).

When construing the blank in the due date appearing just prior to "2006," we find no basis for concluding, as urged by the County, that the parties' failure to write in a month and day means, as a matter of law, that the due date was December 31, 2006. For one thing, the second blank also is not filled in. Furthermore, the facts

23

show that as of March 1, 2005, as evidenced by the letter of intent, the parties believed that a July 2006 completion date – a span of one year and four months – was reasonable but that the parties were required to enter into a contract first. Yet 14 months passed before the May 2006 Agreement was signed, which may have delayed the overall time frame of the project. At a minimum, there is an issue of fact as to whether this delay affected the July 2006 projected completion date. For the above reasons, we conclude that the parties did not select a specific date of completion and, instead, intended a reasonable time for completion of the w/s project, and what the parties considered a reasonable time is a question for the jury.

We also conclude that the jury must decide whether Morgan reasonably acquiesced to additional delays to the project precipitated by outside forces. For example, there is evidence that some delay resulted from the DOT's prohibition of work on the w/s line while the DOT realigned the road where the w/s infrastructure was to be laid. Thus, there is an issue of fact as to when the parties reasonably expected the County would complete installation of the w/s to Grandview given the DOT-caused delays.

Morgan also argues that the commencement of the period for ante litem notice was tolled by the County's fraud. In order to toll a period of limitations, Morgan

24

would have to present evidence that the County fraudulently concealed that Morgan had a breach of contract action such that the fraud debarred or deterred Morgan from knowing that he had that cause of action.[13] The record shows that the project was delayed in 2006 and 2007, in part by the discussion with Rincon about that city providing the w/s service to Grandview, and that the County failed to inform Morgan that Rincon discussions were causing a delay. This issue is so intermingled with the other delay issues that it is not ripe for summary adjudication.

Given all the facts and circumstances, we conclude there is an issue of fact in the present case as to when the parties expected the project to be complete. It follows

---

[13] In Georgia,

Fraud sufficient to toll the statute of limitation requires: (1) actual fraud involving moral turpitude on the part of the defendant; (2) the fraud must conceal the cause of action from the plaintiff, thereby debarring or deterring the knowing of the cause of action; and (3) the plaintiff must have exercised reasonable diligence to discover the cause of action, notwithstanding the failure to discover within the statute of limitation.

*Gibson v. Thompson*, 283 Ga. App. 705, 707 (642 SE2d 366) (2007) (footnote omitted). See also OCGA § 9-3-96 ("If the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud.").

that there is an issue of fact regarding when, if ever, the County breached its agreement to provide w/s to Grandview. Accordingly, there is an issue of fact as to when the plaintiff's claim of breach of contract accrued and therefore whether Roach timely filed *ante litem* notice as required by OCGA § 36-11-1. The trial court therefore did not err in concluding that Roach's claim was not time barred as a matter of law. The issue remains for the jury to decide.

(e) Finally, the County contends that summary judgment was warranted because Morgan failed to mitigate his alleged damages. The 2006 Agreement provides that in the event of the County's nonperformance, Morgan could provide a written notice of default and extend the w/s lines himself. And it is undisputed that he did not do so. But it is also true, as shown above, that the date of any breach of contract is a question of fact. And, by early 2008, Morgan began steps to rezone the property to industrial in an attempt to move the project forward in the face of changing economic conditions that had occurred during the almost two-year delay since the 2006 contract was signed. And the County acknowledged in the rezoning documents that it would provide w/s to the project. Accordingly, issues of fact remain as to when Morgan's duty to mitigate arose and whether any steps he took in that regard were reasonable. See generally *Smith v. Reddick*, 319 Ga. App. 269, 274 (2)

26

(735 SE2d 15) (2012) (whether party's efforts to mitigate damages was reasonable is a question for the jury); *West v. CSX Transp.*, 230 Ga. App. 872, 875 (3) (a) (498 SE2d 67) (1998).

2. The County also contends the trial court erred by denying the County's motion for summary judgment on Roach's claim for expenses of litigation under OCGA § 13-6-11. The County's assertion of error is based entirely on the contention that Roach's breach of contract claim fails as a matter of law, which we have decided adversely to the County. The County having made no other argument, the trial court's decision to deny summary judgment is affirmed.

*Judgment affirmed. Barnes, P. J., and Boggs, J., concur*.